<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IAN M. HONAUER,<br><br>*Plaintiff,*<br><br>v.<br><br>NORTH JERSEY TRUCK CENTER and JOHN MUCHMORE,<br><br>*Defendants.* | Civil No.: 19-cv-8947 (KSH) (CLW)<br><br><br><u>OPINION</u> |

<u>Katharine S. Hayden, U.S.D.J.</u>

**I.     Introduction**

In this employment discrimination action, plaintiff Ian M. Honauer, a former used truck sales manager for defendant North Jersey Truck Center ("NJTC"), claims that he was fired after requesting an accommodation for his broken leg.  Honauer sued NJTC and its president, John Muchmore ("Muchmore," with NJTC, "defendants") for disability discrimination and failure to accommodate under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, and the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 *et seq.,* and for failure to advise him of his rights under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*  Defendants denied Honauer's allegations and asserted a breach of contract counterclaim against him, alleging that Honauer was fired because he failed to perform under the terms of his employment contract—not because of his broken leg.

Defendants now move (D.E. 59) for summary judgment and seek judgment in their favor on each of Honauer's claims.  Honauer opposes and moves (D.E. 57) for summary judgment on defendants' breach of contract counterclaim, arguing that neither an express nor an implied

contract governed his employment with NJTC.  Both motions are fully briefed, and the Court decides them without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1.

## II.     Factual Background

The facts are gleaned from the pleadings, attorney certifications, and supporting exhibits, as well as the parties' joint final pre-trial order.

Honauer began working for NJTC as a used truck sales manager on September 6, 2016. (D.E. 57-3, Matias Mov. Cert. Ex. D.)  He worked in that role until his involuntary termination on March 26, 2018.  (D.E. 56, FPTO Stip. ¶ 26.)  Although the circumstances surrounding Honauer's termination are sharply disputed by the parties, the following facts are undisputed except as specifically noted.

### A.  Honauer's Injury and Medical Treatment

In early March 2018, Honauer went on vacation to Nepal, India.  (*Id.* ¶ 8.)  He was scheduled to return to work on Monday, March 19.  (*Id.* ¶ 9.)  The Friday before, Honauer emailed Muchmore and Gary Streifer, NJTC's chief financial officer and general manager, telling them that he would be unable to return to work as scheduled because he broke his leg:

> So while white water rafting in Nepal I broke my fibula and tibia.  Basically my whole right leg.  I'm leaving tomorrow and land Sunday morning where I'm going straight to the hospital.  I'm hoping they can handle surgery same day.  If not then Monday.  I should be in a cast after that.  I won't be in on Monday but I'm going to see what they say.  If all goes well I'm going to see if Ted or Jason can car pool me into work while I recover since I'm on their way in.
>
> I'll keep you posted as I know more.

(D.E. 66-3, Matias Opp. Cert. Ex. B.)  Muchmore responded: "That's terrible, get yourself health issues addressed and we'll go from there."  (*Id.*)

Honauer landed in the United States on Sunday, March 18 and underwent surgery that night.  (FPTO Stip. ¶ 11.)  He stayed overnight at the hospital and was prescribed Oxycotin for

pain, and blood thinners to treat blood clots that had formed during his flight home.  (*Id.* ¶¶ 11-12.)

### B.  Honauer's Requests for Workplace Accommodations

The next morning, Monday, March 19, at 6:53 a.m., Honauer emailed Muchmore and Streifer:

> So I got back and went directly to the hospital, they were able to do surgery yesterday because it was so bad.  I got a rod and screws in my leg.  They're going to send a physical therapist in today to talk to me and then release me.  They asked if I had a desk job or on the move, so I'm assuming if I can stay at my desk I'll be able to come back to work somewhat quickly, but it will be a 10-12 week recovery time.  Once I get some exact answers I'll let you know this afternoon.
>
> All things considering I'm feeling ok this morning and with crutches I can get around so let's keep our fingers crossed.

(Matias Opp. Cert. Ex. C.)  Muchmore responded less than an hour later: "Ok, glad it seems you have a handle on things.  Call me when you can."  (D.E. 36, FAC Ex. B.)

Honauer received occupational therapy and was cleared to walk with crutches.  (FPTO Stip. ¶ 15.)  He was released from the hospital later that day.  (*Id.*)

The next day, Tuesday, March 20, Honauer gave NJTC a note from his treating orthopedic physician approving Honauer to return to work on Monday, March 26 with a "sedentary work only" restriction.[1]  (Matias Opp. Cert. Ex. D.)  As will become apparent, the parties dispute whether Honauer could perform the essential functions of his job from his desk.

The following morning at 9:01 a.m., Honauer emailed Muchmore to tell him that a coworker, presumably one of Honauer's subordinates, had called in sick.  (*Id.* Ex. F.)  Again, Honauer provided an update on his health and inquired about returning to work:

---

[1] Although the doctor's note is dated March 26, 2018, the parties agree that Honauer gave it to NJTC on March 20.  (*See* FPTO Stip. ¶ 16.)

> Also, I'm back home from the hospital, I have a hematology appointment tomorrow
> due to blood clots they found from the flight, but I want to try to get there either
> Friday or Monday.  I just can't be weight bearing and have to keep my leg elevated,
> which Robyn said she has some milk crates readily available.
>
> I have a follow up with the [doctor] in 2 weeks which I'm hoping they put a boot
> or something that I can put minimal weight on.
>
> Let me know if you're ok with that or what you'd like me to do.

(*Id.*)  It is unclear from the record whether Muchmore responded to this email.

### C.  Muchmore's Initial Inquiry into Honauer's Performance

At some point during Honauer's absence, Muchmore started to question Honauer's work performance.  Muchmore claims that he assumed Honauer's duties as used truck sales manager during his extended absence and, in the process, stumbled upon "very substantial problems" with Honauer's work product.  (D.E. 59-5, Muchmore Cert. ¶¶ 17-18; Matias Opp. Cert. Ex. Z, Muchmore Tr. 37:11-14, 39:8-40:3.)  Honauer, on the other hand, claims that Muchmore initiated a baseless investigation to justify his unlawful termination decision, as Honauer had never been reprimanded or otherwise disciplined prior to his injury.  (Matias Opp. Cert. Ex. X, Streifer Tr. 40:15-22.)

The record evidence shows that on Friday, March 23, Muchmore emailed Honauer at 11:37 a.m.  He told Honauer he had been "reviewing some files due to your absence and [had] some questions."  (Matias Opp. Cert. Ex. H.)  In this email, Muchmore raised eight specific issues with three of Honauer's orders and posed each issue as a question for Honauer to answer.  (*See id.*)  Honauer answered Muchmore's email at 12:44 p.m. and responded point by point.  (*See id.* Ex. I.)  In the body of the email, Honauer wrote as follows:

> Replies are below in red.  There are some additional things I need to get back to
> you on but I need the paperwork in my hands to help jog my memory.  Let me know
> if you have more concerns.  Obviously some new processes to be put in place and

> I will get with Liz on ensuring she gives me all sales orders and reviewing the
> documents fully.

(*Id.*)

Although it is unclear from the record whether Muchmore responded to Honauer's email,
he claims in his certification that Honauer's response was "entirely unsatisfactory" and
demonstrated a lack of understanding of NJTC's business and his role, as well as a "lack of effort."
(Muchmore Cert. ¶ 20.)

### D.  Muchmore Instructs Honauer to Obtain Disability Leave

On Sunday, March 25, at 11:32 a.m., Honauer emailed Muchmore.  He said he had "heard
about not being cleared to return to work on Monday," and asked for "confirmation" as to whether
he would "be forced to go on disability or what the next step is."  (Matias Opp. Cert. Ex. G.)  Less
than an hour later, Muchmore responded and instructed Honauer to go on disability leave:

> Due to your injury your ability to perform your job would be greatly restricted.  I
> don't want you to risk further injury so you need to describe your duties which are
> far more than sitting behind a desk to your doctor and have him tell you how long
> you should be out and that would determine the length of time you should be on
> disability.  Any further questions Gary [Strieifer] is more familiar with the process.

(*Id.*)  Honauer forwarded Muchmore's email to Streifer eight minutes later, asking for information
about going on disability leave.  (*Id.*)

With NJTC's assistance, Honauer received paid, short-term disability leave.  (FPTO Stip.
¶ 27.)  However, neither Streifer nor his human resources liaison, Bea Coda, advised Honauer of
his right to unpaid leave under the FMLA or provided him with FMLA paperwork.  (*See* Streifer
Tr. 69:2-20; *see also* Matias Opp. Cert. Ex. V, Coda Tr. 21:3-7, 15-19.)

### E.  Muchmore Discovers Additional Deficiencies in Honauer's Work Product and Terminates Honauer's Employment

Later in the evening on Sunday, March 25, NJTC's then-vice president of operations, Josh
Mironov, emailed Muchmore to report several issues with one of Honauer's used truck

advertisements.  (Matias Opp. Cert. Ex. K; *see id.* Ex. Y, Mironov Tr. 38:9-12.)  According to

Mironov, he came across the advertisement while he was signing off on "used truck bills," a role

he took on during Honauer's extended absence to "help keep things moving."  (Mironov Tr.

102:22-103:12, 105:21-106:19.)  Mironov explained that when he saw the advertisement attached

to one of Honauer's bills, he was "just blown away at what [he] saw, . . . [m]eaning all the errors,"

and wanted to bring them to Muchmore's attention.  (*Id.* 103:20-104:23, 105:15-20, 106:20-23.)

Approximately one hour later, Mironov emailed Muchmore attaching a spreadsheet of used

truck inventory.  (*See* Matias Opp. Cert. Ex. N.)  Among other things, Mironov stated:

> It's a shame [Honauer] is in the situation he's in.  Any time is bad, but this is just a
> horrible time.  He was struggling as it was and as of now there's absolutely no way
> he can do his job, which he was barely doing in the first place.  After seeing the
> truckpaper ad among other issues, I'm really surprised how asleep at the wheel he
> seemed to be.  It's just that we need someone to somewhat run the dept – take
> customer complaints, handle the headaches, etc.

(*See id.*)

The next morning, Monday, March 26, at 9:13 a.m., Muchmore terminated Honauer's

employment via email, citing performance issues:

> In further review of your responsibilities I have found multiple errors in our
> advertising on top of the document errors I previously referenced to you.  I can't
> accept this level of performance from a manager at our company.  Therefore, your
> employment is terminated effective immediately.  Please notify Liz of any personal
> items in your office and they will be sent to you.

(Matias Opp. Cert. Ex. J.)  Honauer responded at 9:37 a.m.:

> I'm absolutely shocked that this decision was made in such haste for a level of
> employee as a manager without any type of forewarning or explanation.  Even
> without a phone call or any discussion but rather a vague email.  I would love some
> specifics to the advertising questions because I ensured every advertising platform
> was up to date before my vacation.  Anything that happened in the last 2 weeks I
> wasn't there to update.
>
> As for the paperwork, it doesn't appear that there was major neglect but rather lack
> of training and one or two mistakes.  After giving the department 40% growth in

2017 and what appeared to be very good conversations with you over the past months this really comes as a surprise.

(*Id.*)

### III.    Procedural History

Honauer timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on October 27, 2018.  (FAC ¶ 34.)  The EEOC did not make any determination as to the charge but issued a right to sue letter on February 20, 2019.  (*Id.* ¶ 35.) One month later, Honauer filed a six-count complaint in this Court and asserted claims for disability discrimination in violation of the ADA (Count 1) and NJLAD (Count 3); failure to accommodate and engage in the interactive process in violation of the ADA (Count 2) and NJLAD (Count 4); unlawful retaliation and wrongful termination in violation of the NJLAD (Count 5); and violations of the FMLA (Count 6).  (D.E. 1.)

On February 12, 2020,[2] defendants moved to dismiss Honauer's federal claims (Counts 1, 2, and 6) under Fed. R. Civ. P. 12(b)(6) and argued that, upon dismissal, the Court should decline to exercise supplemental jurisdiction over the state law claims.  (*See* D.E. 26.)  On September 10, 2020, the Court granted defendants' motion as to the FMLA claim only, reasoning that Honauer had failed to sufficiently allege his entitlement to FMLA leave.  (D.E. 32, MTD Op. at 10-11; *see also* D.E. 33.)  However, the Court granted Honauer leave to file an amended complaint addressing the deficiencies raised in its opinion.  (MTD Op. at 11-12.)

---

[2] Defendants originally moved to dismiss the complaint on May 21, 2019, but that motion was withdrawn without prejudice.  (D.E. 4, 23.)

Honauer filed the operative first amended complaint on October 1, 2020.[3]  (D.E. 36.)
Defendants answered on October 13, 2020 and asserted a breach of contract counterclaim, alleging
that Honauer failed to substantially perform under the terms of his NJTC employment contract.
(D.E. 37.)   Honauer answered the counterclaim on November 4, 2020 and raised several
affirmative defenses, including that "[t]he parties did not enter into a contractual relationship."
(D.E. 39.)

The parties proceeded to discovery under the supervision of Magistrate Judge Waldor and,
upon completion, filed a joint final pre-trial order.  (D.E. 56.)  The instant motions for summary
judgment followed.  (D.E. 57, 59.)

## IV.    Standard of Review

On summary judgment, the movant bears the initial burden of demonstrating that there is
no genuine dispute as to any material fact such that the movant is entitled to judgment as a matter
of law.  *See* Fed. R. Civ. P. 56(a).  "Once a properly supported motion for summary judgment is
made, the burden shifts to the non-moving party, who must set forth specific facts showing that
there is a genuine issue for trial."  *Mascarenhas v. Rutgers, State Univ.*, 412 F. Supp. 3d 500, 507
(D.N.J. 2019) (Bumb, J.) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).  A
"genuine" dispute of "material" fact exists where a "reasonable jury could return a verdict for the
nonmoving party" or where such fact might otherwise "affect the outcome of the suit under the
governing law."  *Anderson*, 477 U.S. at 248.

---

[3] In the first amended complaint, Honauer expanded his FMLA allegations and clarified, per the
Court's instruction, "which claims, if any, [he] asserts against Muchmore."  (*See* MTD Op. at 11.)
Counts 1 through 4 of the first amended complaint are asserted against NJTC only, whereas Counts
5 and 6 are asserted against both NJTC and Muchmore.

In evaluating a motion for summary judgment, the Court "must view the evidence in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from the evidence." *Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014). However, the Court cannot "'weigh the evidence or make credibility determinations'"; instead, it must "leave that task to the fact-finder at a later trial." *Id.* (quoting *Petruzzi's IGA Supermarkets v. Darling-Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir. 1993)).

## V.    Defendants' Motion for Summary Judgment (D.E. 59)

The Court begins with defendants' motion for summary judgment, in which defendants seek judgment in their favor on each count of the first amended complaint. (D.E. 59-6, Defs. Mov. Br.; D.E. 67, Defs. Reply Br.) Honauer opposes, arguing that he has presented genuine issues for trial as to each count. (D.E. 66, Pl. Opp. Br.) For the reasons that follow, defendants' motion will be denied in its entirety.

### A. Discriminatory Discharge Under the ADA and NJLAD – Against NJTC Only (Counts 1, 3)

Counts 1 and 3 assert discriminatory discharge claims under the ADA and the NJLAD, both of which are analyzed using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Mascarenhas,* 412 F. Supp. 3d at 507 (applying *McDonnell Douglas* to ADA claim); *see also Joseph v. New Jersey Transit Rail Operations Inc.*, 586 F. App'x 890, 892 (3d Cir. 2014) (recognizing applicability of *McDonnell Douglas* to NJLAD claims). Under *McDonnell Douglas*, the plaintiff-employee bears the initial burden of establishing a *prima facie* case of discrimination. *See McDonnell Douglas*, 411 U.S. at 802. If the plaintiff sets forth a *prima facie* case, the burden shifts to the defendant-employer to articulate "some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* Should the employer come forward with a legitimate, nondiscriminatory reason for its adverse employment action, the burden

shifts back to the plaintiff to prove, by a preponderance of the evidence, that the defendant's "stated reason for [the] rejection was in fact pretext."  *Id.* at 804; *see Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999).

### a.   Discriminatory Discharge Under the ADA

Defendants challenge Honauer's ADA discriminatory discharge claim on one ground—that Honauer cannot establish a *prima facie* disability discrimination claim because he has not demonstrated that he was "disabled" within the definition of the ADA.  *See Stewart v. Cnty. of Salem*, 274 F. Supp. 3d 254, 259 (D.N.J. 2017) (Hillman, J.) (to state *prima facie* discrimination claim under ADA, plaintiff must demonstrate that: (i) he was disabled; (ii) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodations; and (iii) he suffered an adverse employment action).

Under the ADA, a person is "disabled" if he has "(A) a physical or mental impairment that substantially limits one or more major life activities[4] . . . ; (B) a record of such an impairment; or (C) being regarded as having such an impairment[.]"  42 U.S.C. § 12102(1)(A).  Honauer relies on the first prong of the ADA disability definition, alleging that his broken leg and blood clots substantially limited his ability to walk, stand, and work.  (*See* FAC ¶ 43.)  Defendants acknowledge that Honauer experienced the medical conditions alleged and appear to concede for purposes of this motion that they qualify as "physical impairments" under the ADA.  *See* 29 C.F.R. § 1630.2(h) (defining physical impairment to include "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, . . . [and] circulatory").  Instead, defendants argue that NJTC is

---

[4] "Major life activities" are defined to include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2)(A).

entitled to judgment as a matter of law because Honauer has not established that "he was substantially limited" in a major life activity.  (Defs. Mov. Br. at 11-12; *see* Defs. Reply Br. at 7.)

Whether an individual is substantially limited in a major life activity requires a case-by-case determination made within the contours of the ADA Amendments Act of 2008 ("ADAAA"), which instructs that the definition of "disability" and, in turn, the term "substantially limits," be construed "in favor of broad coverage of individuals . . . to the maximum extent permitted."  42 U.S.C. § 12102(4)(A), (B); *see Matthews v. Pennsylvania Dep't of Corr.*, 613 F. App'x 163, 167 (3d Cir. 2015) (quoting *Albertson's Inc. v. Kirkingburg*, 527 U.S. 555, 566 (1999)).  That determination does "not demand extensive analysis," as "[t]he primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity."  29 C.F.R. § 1630.2(j)(iii).

Here, the record demonstrates that Honauer broke his right leg, underwent surgery, and was required to stay in the hospital overnight.  (FPTO Stip. ¶ 11.)  He also developed blood clots, which required separate medical attention and treatment.  (*Id.* ¶ 12.)  Honauer completed occupational therapy during his hospital stay and was cleared to walk with crutches but was instructed to keep his right leg elevated.  (*Id.* ¶ 15; Matias Opp. Cert. Ex. F.)  After he was discharged from the hospital, Honauer remained under the care of several doctors including an orthopedic physician, who approved Honauer to return to work approximately one week after surgery but restricted him to "sedentary work only."  (Matias Opp. Cert. Ex. D.)

Defendants do not dispute what the evidence clearly suggests—that, at the time Honauer was fired, his broken leg and blood clots substantially limited his ability to stand and walk.  Instead, they argue that Honauer cannot establish that he was "substantially limited" in a major life activity

because he "proudly admitted" during his deposition that he was "'very' mobile with his crutches." (Defs. Mov. Br. at 11; *see* Defs. Reply Br. at 7.)  Although defendants correctly portray Honauer's deposition testimony,[5] their argument runs afoul of the express language of the ADA, which states that "[t]he determination of whether an impairment substantially limits a major life activity *shall be made without regard to the ameliorative effects of mitigating measures such as . . . medication, medical supplies, equipment, or . . . mobility devices.*"  42 U.S.C. § 12102(4)(E)(i)(I) (emphasis added); *see Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 186, n. 3 (3d Cir. 2010) (recognizing that the ADA "contains a provision declaring that whether an impairment is substantially limiting must be judged without regard to the ameliorative effects of mitigating measures" (internal citations and quotations omitted)).  Defendants cannot broadly rely on the curative impact of Honauer's crutches to circumvent their legal obligations.  Their motion for summary judgment as to Count 1 is therefore denied.

### b.  Discriminatory Discharge Under the NJLAD

Defendants do not challenge Honauer's NJLAD discriminatory discharge claim for failure to establish a *prima facie* case.  Instead, defendants argue that NJTC is entitled to judgment as a matter of law because Honauer "was fired for overwhelming cause"—namely, because he "was unable to adequately perform the duties as the used truck sales manager at NJTC."  (Defs. Mov. Br. at 15-16; Reply Br. at 11-13.)  They rely on N.J.S.A. 10:5-2.1, the "general construction" provision of the NJLAD, which provides in pertinent part as follows:

---

[5] Honauer testified that he was "very mobile" with crutches.  (D.E. 59-2, Honauer Tr. 95:2-96:10.)  Honauer's wife corroborated his testimony during her deposition, though she also indicated that his transition to crutches "took time."  (Matias Opp. Cert. Ex. W, Rutkowski Tr. 12:17-22.)  For example, although Honauer was able to leave the house for doctors' appointments and physical therapy "almost immediately," it took "a couple of weeks" for him to become more mobile.  (*Id.* 13:7-22.)

> Nothing contained in [the NJLAD] shall be construed to . . . prevent the termination or change of the employment of any person *who in the opinion of the employer, reasonably arrived at, is unable to perform adequately the duties of employment, nor to preclude discrimination among individuals on the basis of competence, performance, conduct or any other reasonable standards*[.]

N.J.S.A. 10:5-2.1 (emphasis added).

Defendants contend that N.J.S.A. 10:5-2.1 is "dispositive in this matter," arguing that a legitimate basis for Honauer's termination is "all that is legally required" for the Court to enter judgment in NJTC's favor on Honauer's NJLAD claim. (Defs. Mov. Br. at 15; Defs Reply Br. at 13.) That is not so. N.J.S.A. 10:5-2.1 merely codifies NJTC's burden under *McDonnell Douglas* to articulate a legitimate, non-discriminatory reason for Honauer's termination. *See Terzian v. Montclair Hosp., LLC*, 2023 WL 2473454, at *6 (D.N.J. Mar. 10, 2023) (Salas, J.) (finding that defendant had met its burden under second step of *McDonnell Douglas* analysis and citing N.J.S.A. 10:5-2.1); *accord Petronzi v. Computer Scis. Corp.*, 2018 WL 1586325, at *6 (D.N.J. Apr. 2, 2018) (Sheridan, J.). Satisfaction of that burden does not, as defendants' claim, end the inquiry. Rather, the burden of production shifts back to Honauer to prove, by a preponderance of the evidence, that NJTC's articulated reason for his termination was a pretext for discrimination. *See McDonnell Douglas*, 411 U.S. at 804.

"In order to show pretext, a plaintiff must submit evidence which: (1) casts doubt on the legitimate reason proffered by the employer such that a factfinder could reasonably conclude that the reason was a fabrication; or (2) allow the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the employee's termination." *Johnson v. Keebler-Sunshine Biscuits, Inc.*, 214 F. App'x 239, 242 (3d Cir. 2007). The plaintiff can survive summary judgment by, for example, pointing to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reasons for its action that a reasonable

factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Id.* (quoting *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994)); *see Phillips v. Starbucks Corp.*, 2022 WL 3913373, at *8-10 (D.N.J. Aug. 31, 2022) (Slomsky, J.).

Honauer has presented sufficient evidence from which a reasonable factfinder could conclude that NJTC's proffered reason for his termination was pretext, or that his disabilities were a motivating cause of his termination. As a preliminary matter, Honauer's termination came just days after he reported his injuries to defendants and requested an accommodation. Indeed, Honauer advised defendants of his broken leg on March 16, requested a "sedentary work" accommodation on March 20, and was fired on March 26—the day he was cleared by his doctor to return to work with that accommodation. *See Jackson v. Trump Ent. Resorts, Inc.,* 149 F. Supp. 3d 502, 509 (D.N.J. 2015) (Rodriguez, J.) (denying motion for summary judgment on disability discrimination claim, noting that "temporal proximity" can serve as circumstantial evidence of discrimination). Moreover, although NJTC claims to have fired Honauer for performance issues, nothing in the record suggests that he was ever reprimanded or disciplined for poor performance during the first 18 months of his employment. (*See* Streifer Tr. 40:15-22.) It was not until *after* Honauer advised defendants of his injuries that Muchmore took issue with Honauer's work product.

Critically, there is conflicting evidence in the record regarding when Muchmore decided to review Honauer's work product and whether he enlisted the help of other NJTC employees to do so. For example, as explained *supra*, Muchmore claims that he stumbled upon errors in Honauer's work product on Friday, March 23 in the ordinary course of business. (*See* Muchmore Cert. ¶¶ 17-18; *see also,* Muchmore Tr. 37:5-14, 39:8-40:3.) Consistent with that testimony,

Mironov, who contends that he discovered Honauer's advertising issues on Sunday, March 25, denies having been instructed by Muchmore to "advise . . . of any issues with [Honauer's] work performance." (*See* Mironov Tr. 134:3-9; *see also* Matias Opp. Cert. Ex. K.)  However, included in the record are Muchmore's handwritten notes entitled "conversation w[ith] Josh [Mironov] concerning Ian [Honauer]," which are dated Thursday, March 22 and outline several concerns with Honauer's performance, including the errors that purportedly came to light days later.  (*See* Matias Opp. Cert. Ex. AA.)  Such evidence could, in the mind of a reasonable juror, undermine NJTC's stated justification for firing Honauer.  Defendants' motion for summary judgment on Count 3 is therefore denied.[6]

## B. Failure to Accommodate Under the ADA and NJLAD – Against NJTC Only (Counts 2 and 4)

In Counts 2 and 4, Honauer alleges that NJTC failed to reasonably accommodate his disabilities and to engage in the interactive process regarding his need for an accommodation. Both the ADA and the NJLAD require an employer to make reasonable accommodations to the limitations of a disabled employee, unless the employer can demonstrate that the accommodations would pose an undue hardship.  *See* 42 U.S.C. § 12112(b)(5)(A); *see also* N.J.A.C. 13:13-2.5(b). To state a *prima facie* case for failure to accommodate, the plaintiff must demonstrate that: "(1) the employer knew about the employee's disability, (2) the employee requested accommodations or assistance, (3) the employer did not make a good-faith effort to assist the employee, and (4) the employee could have been reasonably accommodated."  *Behm v. Mack Trucks, Inc.*, 2023 WL

---

[6] Defendants do not specifically challenge Count 5 (NJLAD unlawful termination and retaliation), and instead generally rely on N.J.S.A. 10:5-2.1 to challenge all of Honauer's NJLAD claims.  (*See* Defs. Mov. Br. at 15-16; Defs. Reply Br. at 11-13.)  As such, the Court denies defendants' motion on Count 5 for the same reasons as Count 3.  *See Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 841 (3d Cir. 2016) (recognizing that "[a]ll retaliation and discrimination claims brought under . . . the NJLAD" are analyzed using *McDonnell Douglas*).

3171559, at *2 (3d Cir. May 1, 2023) (ADA *prima facie* elements); *accord Fitzgerald v. Shore Mem'l Hosp.*, 92 F. Supp. 3d 214, 237 (D.N.J. 2015) (Simandle, J.) (NJLAD *prima facie* elements).

Defendants do not dispute for purposes of this motion that Honauer provided NJTC with sufficient information to put it on notice of his disabilities and desire for an accommodation.  At issue here is the third *prima facie* element—whether NJTC made a good-faith effort to assist Honauer in obtaining an accommodation.   "Once an employee makes a request for an accommodation, the employer and employee must engage in a flexible, informal interactive process to determine the possibility of accommodation." *Decree v. United Parcel Serv., Inc.*, 2009 WL 3055382, at *9 (D.N.J. Sept. 18, 2009) (Kugler, J.); *see* 29 C.F.R. § 1630.2(o)(3).  "In this interactive process, both employer and employee must communicate with each other to identify the precise limitations resulting from the disability and potential reasonable accommodation that could overcome those limitations." *Gomez v. Con-Way Cent. Exp. Inc.*, 2009 WL 799243, at *9 (D.N.J. Mar. 24, 2009) (Sheridan, J.) (internal citations and quotations omitted).  Because "[g]ood faith is essential to the accommodation process, . . . both the employer and the employee share the duty to participate in the interactive process in good faith." *Decree*, 2009 WL 3055382, at *9 (citing *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 316 (3d Cir. 1999)).

Defendants ask the Court to find, as a matter of law, that NJTC participated in the interactive process in good faith until Honauer's termination, which cut the interactive process short.  (Defs. Mov. Br. at 13; Defs. Reply Br. at 10.)  However, a reasonable jury could reach the opposite conclusion.  As a preliminary matter, it is unclear from the record whether anyone from NJTC had any substantive discussions with Honauer regarding his need for an accommodation.  During his deposition, Muchmore could not recall whether he had a conversation with Honauer about disability accommodations and indicated that Streifer was ultimately responsible for having

that discussion with Honauer.  Streifer denied ever having such a conversation with Honauer.  (*See* Muchmore Tr. 26:4-9, 47:13-20; *see also* Streifer Tr. 67:6-8.)

As such, defendants rely on the emails between Honauer and Muchmore as evidence that NJTC engaged in an interactive process with Honauer.  Those emails, however, are predominantly one sided and demonstrate that Honauer almost immediately told Muchmore about his injury and that he would need surgery.  (*See* Matias Opp. Cert. Ex. B.)  Honauer gave Muchmore real-time updates about his surgery and its complications, including the development of blood clots.  (*Id.* Exs. C, F.)  He repeatedly expressed his eagerness to return to work and that he had to be on crutches and would need to remain at his desk with his leg elevated.  (*Id.* Exs. B, C, F.)  Honauer also provided defendants with a doctor's note from his treating orthopedic physician, which restricted him to sedentary work.  (*Id.* Ex. D.)

In response, Muchmore did not seek further information or documentation from Honauer regarding his injuries and purported limitations.  Nor did he explain why he thought Honauer's requested accommodations were unworkable, or propose any alternative accommodations or recommendations from Honauer.  Instead, just one day before Honauer was cleared to return to work, Muchmore instructed him in an email to go out on disability leave, reasoning that his "ability to perform [his] job would be greatly restricted" by his injury.  (*See* Matias Opp. Cert. Ex. G.)

In light of the foregoing, defendants' motion for summary judgment on Counts 2 and 4 is denied.

### C.  FMLA Violations – Against Both Defendants (Count 6)

In Count 6, Honauer claims that defendants should have advised him of his right to unpaid FMLA leave for the week of March 19 through March 23, 2018—the week he was out of work due to his surgery and recovery—because he "did not have any additional paid time off and

17

believed that if he did not work he would not receive a paycheck or could be terminated." (FAC ¶¶ 109-110.) Honauer alleges that by failing to do so, defendants effectively "foreclosed" his right to make an informed decision about his care and return to work. (*Id.* ¶¶ 111-112.)

Under the FMLA, "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period" if the employee has a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). When an eligible employee returns from FMLA leave, the employee is entitled to reinstatement to his or her former position or an equivalent one. 29 U.S.C. § 2614(a)(1). The right to reinstatement is qualified, however, by a "statutory directive that it does not entitle a restored employee to a right, benefit or position to which the employee would not 'have been entitled had the employee not taken the leave.'" *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 141 (3d Cir. 2004) (quoting 29 U.S.C. § 2614(a)(3)(B)).

The FMLA expressly forbids employers from engaging in acts that "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter," 29 U.S.C. § 2615(a)(1), and grants employees a cause of action against employers who engage in such acts, *see* 29 U.S.C. § 2617. Department of Labor ("DOL") regulations "impose upon the employer obligations to communicate with employees regarding their rights under the FMLA." *Conoshenti*, 364 F.3d at 142. Under those regulations, "[w]hen an employee requests FMLA leave, or when the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason, the employer must notify the employee of the employee's eligibility within five business days, absent extenuating circumstances." 29 C.F.R. § 825.300(b)(1). DOL regulations also require employers to "provide written notice detailing the specific expectations and obligations of the employee and explaining any consequences of a failure to meet these

obligations." 29 C.F.R. § 825.300(c)(1). Moreover, "[t]he employer is responsible in all circumstances for designating leave as FMLA-qualifying, and for giving notice of the designation to the employee." 29 C.F.R. § 825.300(d)(1).

Defendants appear to concede for purposes of this motion that they failed to inform Honauer of his rights under the FMLA. Instead, they argue that they were not required to do so because Honauer expressed his desire to return to work—not to take leave. (*See* Defs. Mov. Br. at 14.) Although the record supports defendants' argument that Honauer never formally requested unpaid leave, the FMLA does not impose a formal notice requirement on employees. To the contrary, DOL regulations state that the employee "need not expressly assert rights under the FMLA or even mention the FMLA." 29 C.F.R. § 825.302(c); *see Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 402 (3d Cir. 2007) ("In providing notice, the employee need not use any magic words"). All an employee must provide is "at least verbal notice *sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave*." 29 C.F.R. § 825.302(c) (emphasis added). That is precisely what Honauer did here: he informed Muchmore and Streifer of the surgery almost immediately and indicated that his doctors expected a 10–12-week recovery, with the caveat that he could return to work sooner if permitted to work from his desk. (*See* Matias Opp. Cert. Exs. B, C.)

Defendants next argue that Honauer was not qualified for FMLA leave because he was mobile with crutches and therefore did not have a "serious health condition." (Defs. Mov. Br. at 14.) Under the FMLA, a "serious health condition" is defined to include "an illness, injury, impairment, or physical or mental condition that involves . . . inpatient care in a hospital, hospice,

or residential medical care facility."[7]  29 U.S.C. § 2611(11)(A); 29 C.F.R. § 825.113(a).  DOL regulations define "inpatient care" as "an overnight stay in a hospital, hospice, or residential medical care facility, including any period of incapacity as defined in § 825.113(b), or any subsequent treatment in connection with such inpatient care."  29 C.F.R. § 825.114.  In turn, "incapacity" is defined as the "inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom."  29 C.F.R. § 825.113(b).  Here, it undisputed that Honauer underwent surgery for his broken leg and was required to spend one night in the hospital.  The record demonstrates that when Honauer advised defendants of the surgery and its complications, he was unable to stand or walk—let alone work.  Although Honauer was cleared to use crutches by the time he left the hospital, the record demonstrates that his transition to crutches "took time."  (*See* Rutkowski Tr. 12:17-22, 13:17-22.)  Consistent with his limitations, Honauer was cleared to perform "sedentary work only," to begin one week *after* his surgery.  (Matias Opp. Cert. Ex. D.)  On these facts, defendants have not demonstrated that Honauer's medical conditions are inconsistent with the FMLA's definition of a "serious health condition."

Finally, defendants argue that Honauer's FMLA claim fails as a matter of law because he received paid disability leave, so "there was only an economic benefit in his favor, not any cost to him."  (Defs. Mov. Br. at 14; Defs. Reply Br. at 10.)  That reasoning is misguided.  "When, as in this case, an FMLA interference claim is premised on an employer's failure to provide timely notice, the plaintiff must show that the employer's failure to provide notice resulted in an

---

[7] An employee also has a "serious health condition" under the FMLA if he or she has an injury or illness that requires "continuing treatment by a health care provider."  29 U.S.C. § 2611(11)(B); 29 C.F.R. § 825.113(a).  However, the Court need not determine whether Honauer satisfies the "continuing treatment" prong of the definition in light of its conclusion, *infra*, that Honauer received qualifying "inpatient care."

'impairment of [his] rights and resulting prejudice.'" *Boles v. Wal-Mart Stores, Inc.*, 2014 WL 1266216, at *16 (D.N.J. Mar. 26, 2014) (Linares, J.) (quoting *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 90 (2002)).  Prejudice has been broadly interpreted by the Third Circuit to encompass situations where the employee was precluded from making an "informed decision about structuring his leave and . . . his plan of recovery, in such a way as to preserve the job protection afforded by the [FMLA]." *Conoshenti*, 364 F.3d at 142-43; *accord Lupyan v. Corinthian Colleges Inc.*, 761 F.3d 314, 323 (3d Cir. 2014) (to demonstrate "prejudice," employee required to show that "had she been properly informed of her FMLA rights, she could have structured her leave differently").  In short, if a jury were to find that defendants failed to advise Honauer of his rights under the FMLA, "it could also reasonably find that [Honauer's] consequent inability to make an informed decision as to how to structure his leave amounted to prejudice."[8] *Boles*, 2014 WL 1266216, at *17.  Defendants' motion for summary judgment on Count 6 is denied.

## VI.    Honauer's Motion for Summary Judgment (D.E. 57)

Honauer seeks judgment in his favor on defendants' breach of contract counterclaim on grounds that neither an express nor an implied contract governed his employment with NJTC.  (D.E. 57-5, Pl. Mov. Br.; D.E. 64, Pl. Reply Br.)  Defendants contend that a valid and enforceable contract was formed when Honauer accepted NJTC's written offer of employment and began performing the duties of a used truck sales manager.  (D.E. 62, Defs. Opp. Br.)

---

[8] Defendants also appear to challenge Honauer's FMLA claim for lack of a cognizable remedy, arguing that Honauer suffered no lost wages because he worked from home during the week of March 19, 2018 and then received paid, short-term disability leave.  (*See* Defs Mov. Br. at 14.)  That argument is unavailing, as the FMLA expressly provides for damages even where compensation has not been "lost to the employee."  *See* 29 U.S.C. § 2617(a)(1)(A)(i)(II) (indicating that in the absence of lost wages, employee may recover "any actual monetary losses sustained by the employee as a direct result of the violation, such as the cost of providing care").

At the outset, the Court must address the perplexing nature of defendants' counterclaim.  It is well settled that employment is presumed to be "at will" under New Jersey law, meaning the employer "may terminate employment for good reason, bad reason, or no reason at all."  *Anderson v. DSM N.V.*, 589 F. Supp. 2d 528, 534 (D.N.J. 2008) (Greenaway, J.).  Typically, employees who have been terminated try to overcome the at-will presumption by pointing to purported "implied contracts"—usually employment documents like applications, offer letters, and employee handbooks—that could be construed as providing terms and conditions of employment and, by association, permissible grounds for dismissal.  *See, e.g., Doll v. Port Auth. Trans-Hudson Corp.*, 92 F. Supp. 2d 416, 422 (D.N.J. 2000) (Hochberg, J.), *aff'd*, 261 F.3d 491 (3d Cir. 2001) (granting employer's summary judgment motion on breach of contract claim and rejecting employee's argument that "book of rules" created implied contract); *see also Anderson*, 589 F. Supp. 2d at 534 (granting employer's summary judgment motion on breach of contract claim and rejecting employee's argument that "transfer of position letter" constituted employment contract).  To negate implied contracts with their employees, employers routinely include prominent disclaimers in their written materials indicating that they are not to be construed as employment contracts.  *See, e.g.*, *Edwards v. Schlumberger-Wells Servs., a Div. of Schlumberger Tech.*, 984 F. Supp. 264, 284-85 (D.N.J. 1997) (Irenas, J.) (granting motion for summary judgment on employee's breach of contract claim where employee handbook included prominent disclaimer "defeat[ing] any implication of an employment contract").  That is precisely what NJTC did here.  Honauer's written application and offer letter stressed that his employment with NJTC would be at will, and both NJTC's employee handbook and acknowledgement form expressly disclaimed the creation of a contractual relationship between NJTC and its employees.  (*See* D.E. 57-3, Matias Mov. Cert. Exs. C, D, E, F.)

Now defendants want just the opposite, arguing that NJTC's written materials created a valid and enforceable contract with Honauer.[9]  They ignore the at-will presumption and instead rely solely on general contract principles unmoored to the employment context, arguing that NJTC's offer letter and Honauer's subsequent performance "in essence" satisfy the elements of an enforceable contract—namely, offer, acceptance, and consideration.  (*See* Defs. Opp. Br. at 7-10.) Unsurprisingly, defendants have not cited any precedent that would support the Court's exclusive application of general contract interpretation principles in this context.[10]

Even if the Court were to interpret Honauer's offer letter as defendants propose, their counterclaim would still fail as a matter of law.  The offer letter NJTC sent Honauer outlines several key terms and conditions of his employment with NJTC—namely, his title, salary, commission and benefit eligibility, *and at-will employment status*—but is silent on the specific duties and responsibilities of a used truck sales manager that Honauer allegedly breached.  (*See* D.E. 37, CC ¶¶ 18-19 (alleging that Honauer was required to "faithfully perform his duties" but breached that obligation).)  In fact, the only reference in the offer letter to the term "duties" appears

---

[9] Defendants risk setting a dangerous precedent for NJTC's business by asserting a breach of contract counterclaim against Honauer, as terminated employees could argue that NJTC's written materials negate the at-will presumption.  Indeed, Honauer seeks to do just that if the Court denies his motion for summary judgment.  (*See* Pl. Mov. Br. at 2 (requesting leave to amend complaint "to include a claim for breach of contract").)

[10] Defendants cite one, factually inapposite employment case in their opposition brief.  *See Goldfarb v. Solimine*, 245 N.J. 326 (2021) (plaintiff sued prospective employer for promissory estoppel arising from alleged oral promise of employment).  Defendants' remaining cases are outside the employment context. *See Globe Motor Co. v. Igdalev*, 225 N.J. 469 (2016) (agreement to settle litigation); *Smith v. SBC Commc'ns Inc.*, 178 N.J. 265 (2004) (telephone calling cards' terms and conditions); *Weichert Co. Realtors v. Ryan*, 128 N.J. 427 (1992) (brokerage commissions agreement); *Creek Ranch, Inc. v. New Jersey Tpk. Auth.*, 75 N.J. 421 (1978) (right of entry); *Krosnowski v. Krosnowski*, 22 N.J. 376 (1956) (action to foreclose mortgage); *Washington Const. Co. v. Spinella*, 8 N.J. 212 (1951) (construction contract); *Casriel v. King*, 2 N.J. 45 (1949) (contract for sale of land).

in connection with Honauer's at-will employment status.  (*See* Matias Mov. Cert. Ex. D ("NJTC may eliminate or change any term or condition of your employment, including without limitation, *your . . . duties* and level of authority, *at will, at any time, with or without cause or notice*." (emphasis added).)   Defendants point to a document Honauer signed during the employee onboarding process which outlines the specific responsiblities of a used truck sales manager, arguing that those duties "became part of the contract."  (Defs. Opp. Br. at 9; *see* Matias Mov. Cert. Ex. G.)  However, the Court cannot incorporate defendants' cited document by reference into Honauer's offer letter without violating the express terms of the offer letter itself, which provides as follows: "This offer of employment *reflects the entire understanding between you and NJTC with respect to the nature of your employment relationship*."  (Matias Opp. Cert. Ex. D (emphasis added).)

In short, defendants cannot demonstrate as a matter of law that a valid contract was formed between NJTC and Honauer, or that Honauer breached a duty owed under that contract.  Accordingly, Honauer's motion for summary judgment in his favor on their counterclaim is granted.

## VII.    Conclusion

For the foregoing reasons, Honauer's motion for summary judgment (D.E. 57) is granted and defendants' motion (D.E. 59) is denied.  An appropriate order will issue.


                                                    /s/ Katharine S. Hayden
Date: May 25, 2023                                  Katharine S. Hayden, U.S.D.J.